# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 3 0 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE | § | |
| COMPANY, As Subrogee of | § | |
| LOWE-NORTH CONSTRUCTION | § | |
| | § | |
| VS. | § | C.A. NO. B-04-091 |
| | § | |
| MOBILE CRANE SERVICE, INC., | § | |
| JESUS FRANCISCO AVALOS, RS | § | |
| INFORMATION SYSTEMS, INC AND | § | |
| DAVE BRUGGEMANN, INDIVIDUALLY, | § | |
| AND d/b/a CASCADE SUMMIT ELECTRIC | § | |

## ZURICH AMERICAN INSURANCE COMPANY, AS SUBROGEE OF LOWE-NOTH CONSTRUCTION'S INITIAL DISCLOSURE

TO:    Defendants, Mobile Crane Service, Inc. and Jesus Francisco Avalos, by and through their attorney of record, Lynse S. Larance, Skaggs & Gonzales, LLP, 710 Laurel, McAllen, Texas 78502-2285.

TO:    Defendant/Third Party Defendant, RS Information Systems, Inc., by and through its attorney of record, Jody Ray Mask, Thornton, Summers, Biechlin, Dunham & Brown, L.C., 418 East Dove Avenue, McAllen, Texas 78504.

TO:    Defendants/Third Party Defendant, Dave Bruggemann, Individually and d/b/a Cascade Summit Electric, by and through their attorney of record, Will W. Pierson, Royston, Rayzor, Vickery & Williams, L.L.P., 1700 Wilson Plaza West, 606 North Caranchua, Corpus Christi, Texas 78476.

TO:    Third Party Defendant/Interested Party, United States of America, U.S Department of Commerce, and National Oceanic and Atmospheric Administration, by and through their attorney of record, Nancy L. Masso, Assistant United States Attorney, 600 East Harrison Street, Suite 201, Brownsville, Texas 78520.

Defendant, **ZURICH AMERICAN INSURANCE COMPANY**, makes these initial disclosures as required by Federal Rule of Evidence 26(a)(1).

## A. Individuals with Discoverable Information

1.    The name, address (work and home), and telephone number (work and home) of individuals likely to have discoverable information that Intervenor may use to support its claims or defenses include:

**David Lowe, V.P.**
**Lowe-North Construction, Inc.**
**800 A-Line Drive**
**Spring Hill, KS 66083**
**913/686-3080**

**This witness is believed to have knowledge relating to the contractual relationships between Lowe-North Construction, Inc. and all of the parties in this action and Powerware an entity that is not a party to this lawsuit. In addition, this witness is believed to have knowledge of the damages sustained in this case by Lowe-North and Zurich resulting for the negligence of Mobile Crane Services, Inc.**

**Kim Parsley, Project Manager**
**Lowe-North Construction, Inc.**
**800 A-Line Drive**
**Spring Hill, KS 66083**
**913/686-3080**

**This witness is believed to have knowledge relating to the contractual relationships between Lowe-North Construction, Inc. and all of the parties in this action and Powerware an entity that is not a party to this lawsuit. In addition, this witness is believed to have knowledge of the damages sustained in this case by Lowe-North and Zurich resulting for the negligence of Mobile Crane Services, Inc.**

**Mac Booth, Job Foreman**
**Lowe-North Construction, Inc.**
**800 A-Line Drive**
**Spring Hill, KS 66083**
**913/686-3080**

**This individual is an eyewitness to the incident. This witness is believed to have knowledge relating to the contractual relationships between Lowe-North Construction, Inc. and all of the parties in this action and Powerware an entity that is not a party to this lawsuit. In addition, this witness is believed to have knowledge of the damages sustained in this case by Lowe-North and Zurich resulting for the negligence of Mobile Crane Services, Inc. This individual also has personal knowledge of the negotiations that took place between Lowe-North and Mobile Crane before the incident and the statements and actions of Mobile Crane Services, Inc.**

James C. Shawn, President
Mobile Crane Services, Inc.
807 E. Highway 83
Pharr, Texas 78577
956/787-7777

This individual is Defendant's corporate representative. He has knowledge of Mobile Crane's policies and procedures.

Robert Correa, Safety Director
Mobile Crane Services, Inc.
807 E. Highway 83
Pharr, Texas 78577
956/787-7777

This individual was involved in the pre-contract meeting between Lowe-North and Mobile Crane. He has knowledge of the type of crane that was ordered by Lowe-North and has knowledge that an undersized crane was provided. This individual also investigated the incident. He has knowledge of Mobile Crane's policies and procedures.

Bill Hunter, Dispatcher
Mobile Crane Services, Inc.
807 E. Highway 83
Pharr, Texas 78577
956/787-7777

He has knowledge of the type of crane that was ordered by Lowe-North and has knowledge that an undersized crane was provided. This individual also investigated the incident. He has knowledge of Mobile Crane's policies and procedures.

Frank Avalos, Operator
Mobile Crane Services, Inc.
807 E. Highway 83
Pharr, Texas 78577
956/787-7777

This individual is an eye witness to the incident.

Sergio Zamora, Rigger
Mobile Crane Services, Inc.
807 E. Highway 83
Pharr, Texas 78577
956/787-7777
This individual is an eye witness to the incident.

Gary T. Harper
R.S. Information Systems, Inc.
1615 Old Meadow Road
McLean, Virgina 22102
703/734-7800

It is believed that this individual is an eye witness to the incident.

Dave Bruggeman
Cascade Summit Electric
PMB 173
2149 W. Cascade, Suite 106A
Hood River, Oregon 97031

It is believed that this individual is an eye witness to the incident.

Kevin McCann
Powerware
8609 Six Forks Road
Raleigh, North Carolina 27615-2966
919/713-3405

This individual has knowledge relating to the type of equipment being installed.
And the Contracts between Powerware and The U.S. Department of Commerce,
National Oceanic & Atmospheric Administration, and their contract with Lowe-
North. This individual has knowledge of the damage done to the equipment being
installed in the incident and the fact there is no secondary market for the equipment
once it has been damaged.

Bob Delaney, Field Service Manager
Powerware
8609 Six Forks Road
Raleigh, North Carolina 27615-2966
919/713-3405

This individual has knowledge relating to the type of equipment being installed.
And the Contracts between Powerware and The U.S. Department of Commerce,
National Oceanic & Atmospheric Administration, and their contract with Lowe-
North. This individual has knowledge of the damage done to the equipment being
installed in the incident and the fact there is no secondary market for the equipment
once it has been damaged

**Doug Nowatka, Dispatch Manager**
**Powerware**
**8609 Six Forks Road**
**Raleigh, North Carolina 27615-2966**
**919/713-3405**

This individual has knowledge relating to the type of equipment being installed. And the Contracts between Powerware and The U.S. Department of Commerce, National Oceanic & Atmospheric Administration, and their contract with Lowe-North. This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged.

**Thomas Crochet**
**Powerware**
**8609 Six Forks Road**
**Raleigh, North Carolina 27615-2966**
**919/713-3405**

This individual has knowledge relating to the type of equipment being installed. And the Contracts between Powerware and The U.S. Department of Commerce, National Oceanic & Atmospheric Administration, and their contract with Lowe-North. This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged

**Lisa K. Armour, Contracts Administrator**
**Powerware**
**8609 Six Forks Road**
**Raleigh, North Carolina 27615-2966**
**919/713-3405**

This individual has knowledge relating to the type of equipment being installed. And the Contracts between Powerware and The U.S. Department of Commerce, National Oceanic & Atmospheric Administration, and their contract with Lowe-North. This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged

**Jerry F. Pugh, Contracts Manager**
**Powerware**
**8609 Six Forks Road**
**Raleigh, North Carolina 27615-2966**
**919/713-3405**

This individual has knowledge relating to the type of equipment being installed. And the Contracts between Powerware and The U.S. Department of Commerce, National Oceanic & Atmospheric Administration, and their contract with Lowe-North. This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged

**Maxine R. Hodges, Contracting Officer**
**U.S. Department of Commerce**
**National Oceanic & Atmospheric Administration**
**1325 E. West Highway, SSMC2, Rm. 15254**
**Silver Springs, Maryland**
**301/713-3405**

This individual has knowledge of the contracts between the parties. This individual has knowledge of the damage done to the equipment in the incident. This individual has knowledge relating to the United States rejection of the equipment after it has been damaged.

**Bob Wittreich, Electronic Systems Analyst**
**U.S. Department of Commerce**
**National Oceanic & Atmospheric Administration**
**1325 E. West Highway, SSMC2, Rm. 15254**
**Silver Springs, Maryland**
**301/713-3405**

This individual has knowledge of the contracts between the parties. This individual has knowledge of the damage done to the equipment in the incident. This individual has knowledge relating to the United States rejection of the equipment after it has been damaged. This individual is believed to be an eye witness to the incident.

**Rick Watson**
**Fibrebond Corp.**
**1300 Davenport**
**Minden, Louisiana 71055**
**318/377-1030**

This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged

**Barry Hammonds**
**Fibrebond Corp.**
**1300 Davenport**
**Minden, Louisiana 71055**
**318/377-1030**

This individual has knowledge of the damage done to the equipment being installed in the incident and the fact there is no secondary market for the equipment once it has been damaged

Larry Hendrick
Hendrick Claim Service
P.O. Box 2993
McAllen, Texas 78502
956/687-6773

This individual adjusted the claim for Zurich.

Paul Krieger
SEA/LWG
15423 Vantage Pkwy E., Suite 114
Houston, Texas 77032
281/442-3473

It is believed this individual adjusted the claim for Mobile Crane.

Judith Borel, Recovery Specialist
Zurich American Insurance Company
P.O. Box 66944
Chicago, Illinois 60666
214/866-1542

This individual is the subrogation specialist assigned to the claim by Zurich and has knowledge of the total amount of Zurich's lien.

Sherry Tilton
Zurich American Insurance Company
P.O. Box 619507
Dallas, Texas 75261

This individual is the subrogation specialist assigned to the claim by Zurich and has knowledge of the total amount of Zurich's lien.

John Earnheart
MGE UPS Systems
Field Services Engineer, Team Leader in Houston
13415 Blackbird Dr.
Cypress, Texas 77429

This individual has both factual and expert knowledge relating to the damage to the equipment, and lack of secondary market for the equipment.

## B. Relevant Documents and Tangible Things

2.    Attached are copies of all documents, data compilations, and tangible things in Intervenor's possession, custody or control that Plaintiff believes are relevant to disputed facts alleged with particularity in the pleadings.

## C. Information Related to Calculation of Damages

3.    A computation of Plaintiff's damages is below; all nonprivileged documents on which this computation are attached.

The cost of replacement of the damaged equipment and additional expense associated with installing the replacement equipment is $111,818.89.

## D. Insurance

4.    All insurance agreements required to be disclosed are available for inspection and copying.

Respectfully submitted,

KELLY, SMITH & MURRAH, P.C.

Melissa Nance Murrah
State Bar No. 00788104
Kenneth J. Irwin
State Bar No. 10426950
4305 Yoakum Boulevard
Houston, Texas 77006
(713) 861-9900
(713) 861-7100 facsimile

ATTORNEY IN CHARGE FOR
DEFENDANT, ZURICH AMERICAN
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on the 27$^{\text{H}}$ day of August, 2004, true and correct copy of the foregoing instrument has been forwarded by United States Certified Mail, Return Receipt Requested, and/or by express delivery, and/or by facsimile transmission, to the following counsel of record:

Lynse S. Larance
Skaggs & Gonzales, LLP
710 Laurel
McAllen, Texas 78502-2285

Jody Ray Mask
Thornton, Summers, Biechlin, Dunham & Brown, L.C.
418 East Dove Avenue
McAllen, Texas 78504

Will W. Pierson
Royston, Rayzor, Vickery & Williams, L.L.P.
1700 Wilson Plaza West
606 North Carancahua
Corpus Christi, Texas 78476

Nancy L. Masso
Assistant United States Attorney
600 East Harrison Street, Suite 201
Brownsville, Texas 78520


Kenneth J. Irwin

---

# Powerware 9



More than the power standard for data centers, facilities and network solutions,
the Powerware 9315 is the industry's most reliable and feature-rich UPS.
The Powerware 9315 uses intelligent communications and digital signal processing
to provide maximum uptime and 99.9999% availability. And the Powerware 9315
can be paralleled for both redundancy and capacity using patented Powerware Hot
Sync technology.

## Features and Benefits

▶ Flexible battery runtime option to customize your application
▶ ProActive Service Plan included for the first year following installation, pro-
  viding maximum uptime for mission-critical systems
▶ True double conversion online technology protects the critical load from daily
  power variation on the input
▶ DC Expert monitors and maintains battery health, provides state-of-charge
  and dynamically updates information on battery time remaining
▶ UPS initiates outcall for user-selected events
▶ Intelligent Input Filter provides superior generator interface and provides
  additional isolation between input and output
▶ Intelligent design reduces component count significantly which reduces
  points-of-failure, maximizing availability
▶ Monitor panel provides single-button start along with pushbutton
  controls to easily access data regarding UPS status
▶ Intelligent controls with digital signal processing (DSP)
  pristine output signal
▶ True pulse width modulation (PWM) technology enables IGBTs to
  switch at their highest capacity, increasing system reliability and
  ensuring perfect power on the output
▶ Powerware Hot Sync patented paralleling technology requires
  no communication between modules, eliminating a system-level
  single point-of-failure

The Powerware 9315 is available in
the following system configurations:

▶ Single Module – Reverse Transfer
▶ Multi-Module – Parallel for Redundancy
▶ Multi-Module – Parallel for Capacity

**9315 Models:**

9315-40
9315-50
9315-65
9315-80

9315-100
9315-200
9315-250
9315-300
9315-400
9315-500

The Powerware 9315 is designed for a wide range
of critical applications, including:

▶ Data Centers          ▶ Server Farms
▶ Facilities            ▶ Telecommunications
▶ Enterprise Networks   ▶ Internet Service Providers





# POWERWARE

April 9, 2002

NOAA-02-0338

Lowe-North Construction, Inc.
800 A-Line Drive
Spring Hill, Kansas 66083

Attention:  David Lowe, Vice President

Subject: Damaged Shelter: Site – Brownsville, TX
Transition Power Maintenance Shelter Systems
Subcontract Number FSD-97-SKT-0032
Task Order #56-DGNW-2-25111, Brownsville, Texas site

Dear Mr. Lowe:

Invensys Powerware would like to thank you for your quick response in handling the dropped building at the Brownsville, Texas site. However, Powerware is taking exception to the second paragraph of your letter dated April 3, 2002.

In the paragraph you state that after the insurance company investigates the incident, you will be able to go into more detail as to the reimbursement of monies due Powerware. I would like to reference Paragraph XIV – Liabilities and Indemnification of the Subcontract. This paragraph states that the Lowe-North and its sub-subcontractors will be held liable for the loss, damage or destruction of property or injury to persons in connection with the performance of this Agreement by Lowe-North, its employees, agents, sub-subcontractors and representatives.

The Government has advised Invensys Powerware that the building and its contents are a total loss and that the Government will not accept the building that was dropped. The Manufacturer of the equipment has voided the warrantee for the equipment because it was dropped. Because the batteries are not meant to be dropped, they will not be covered under warrantee either. This building and equipment were designed and made for the Government specifically for the Brownsville, Texas site. Because of this, there is no market value for the damaged building or equipment for Powerware. For this reason, Powerware is expecting full compensation for the cost of the new shelter and all equipment associated with it along with the freight charges to get the new building to the site.

If you have any questions or require additional information, please call me at (919) 870-3143.

Sincerely,

Jerry F. Pugh
Contracts Manager
Federal Systems Division

Cc:     Kim Parsley, Lowe-North
Dave Hryb, Powerware
Doug Nowatka, Powerware

CORPORATE HEADQUARTERS
2502 Six Forks Road, Raleigh, North Carolina 27615
919-870-3020 • Fax: 800 753-9433
e-mail: info@powerware.com    www.powerware.com



# POWERWARE

March 28, 2002                                              NOAA-02-0300

Lowe-North Construction, Inc.
800 A-Line Drive
Spring Hill, Kansas 66083

Attention:      Kim Parsley, Program Manager

Subject:        Damaged Shelter: Site – Brownsville, TX
                Transition Power Maintenance Shelter Systems
                Subcontract Number FSD-97-SKT-0032
                Task Order #56-DGNW-2-25111, Brownsville, Texas site

Dear Ms. Parsley:

The purpose of this letter is to inform you Invensys Powerware is aware of that the shelter for Brownsville, TX was dropped by the crane on Wednesday, March 27, 2002, around 12 noon Central time. The Government has determined that it is not in their best interest to accept a repaired damage shelter. Invensys Powerware requests that a new completely equipped shelter be delivered and installed. I have enclosed a copy of the Governments letter to Powerware for your reference.

Invensys Powerware requests that you reimburse us for the costs of a new shelter and equipment. Please be advised that the air conditioner requires corrosion resistant coated coils. The replacement costs for a Type 5 (1) shelter is $101,190.82. This amount includes the costs for a new shelter, equipment, coated coil air conditioner unit and freight charges.

It is requested that you provide a plan of action to address this matter by Wednesday, April 3, 2002. Invensys Powerware will advise you as to when the shelter will be ready to be installed.

If you have any questions or require additional information, please call me at (919) 870-3385.

Sincerely,

Lisa K. Armour
Contracts Administrator
Federal Systems Division

CORPORATE HEADQUARTERS
8609 Six Forks Road, Raleigh, North Carolina 27615
919.872.3020 · Fax: 800.753.9433
e-mail: info@powerware.com · www.powerware.com

invensys
An Invensys company



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
OFFICE OF FINANCE AND ADMINISTRATION

March 28, 2002

NWS Business Management Divison
1325 East West Highway, SSMC 2, Rm. 15254
Silver Spring, Maryland 20910

Powerware Corporation/Federal
Systems Division
Attention: Jerry F. Pugh
8609 Six Forks Rd.
Raleigh, North Carolina 27615-2966

Subject:    Damaged Shelter: Site-Brownsville, Texas
            Contract Number 50-DGNW-7-90004
            Task Order 56-DGNW-2-25111

Dear Mr. Pugh:

The purpose of this letter is to inform you that the Government is aware that the shelter
for Brownsville, Texas, was dropped by the crane on Wednesday, March 27, 2002 around
Noon Central time. The Government Observers have reviewed the damages to the shelter
and have determined that the shelter has sustained severe damage. Acceptable physical
and verbal evidence has been presented to allow the Government to make the
determination that it is in their best interest to request that a new completely stuffed shelter
be delivered and installed. The Government is in agreement that it is not in their best
interest to accept a repaired damage shelter when we have contracted to receive a brand
new shelter at an estimated cost of $94,000.

Please provide the Serial Numbers and related information pertaining to the damaged
shelter, immediately.

It is requested that you provide a plan of action to address this matter by Friday, April 5,
2002.

Should you have any further questions or comments regarding this matter, please do not
hesitate to contact Ms. Maxine Hodges at (301) 713-3405, ext. 110.

Sincerely,

Maxine R. Hodges

Maxine R. Hodges
Contracting Officer

Printed on Recycled Paper

# ZURICH-AMERICAN INSURANCE GROUP

## SWORN STATEMENT IN PROOF OF LOSS

[X] Maryland Casualty Comapny    [ ] Zurich Insurance Company
[ ] American Zurich Insurance Company
[ ] American Guarantee and Liability Insurance Company

562011177    111

Amount of policy at time of loss: $_____    Policy number: CON 50840702

Agent: Lockton Companies, Inc.

Agency address: 444 W. 47th St., Ste. 900

City: Kansas City _____ State: KS    ZIP code: 64112-1913

Date issued: 11/01/01 _____ Date expired: 01/01/03

At time of loss, by the above indicated policy of insurance, you insured Lowe-North Construction, Inc.

against loss by all risk _____ to the property described according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. **Time and Origin:** A (state kind) _____ loss occurred about the hour of _____ o'clock [ ] a.m. [ ] p.m., on the 4th day of March 19 '02.

The cause and origin of the said loss were: dropping of building during installation

2. **Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: New construction

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was: N/A

No other person or persons had any interest therein or incumbrance thereon, except: N/A

4. **Changes:** Since the policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: N/A

5. **Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of loss, $ 250,000 BR _____ as more particularly specified in the apportionment attached, besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. **The Actual Cash Value** of said property at the time of loss was: $_____

7. **The Whole Loss and Damage** was: $ 111,515.89 $10,000 advance & $1000 ded

8. **The Amount Claimed** under the above numbered policy is: $ 101,515.89

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

**The furnishing of this blank or the preparation of proofs, by a representative of the above insurance company is not a waiver of any of its rights.**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

Insured: _____

County of: _____ State of: _____

Subscribed and sworn to before me this _____ day of _____ 19___

Notary Public: _____

C1-10170-B (NY) (11/94)
Page 1 of 2





# LOWE-NORTH CONSTRUCTION, INC.

GENERAL CONTRACTORS
800 A-LINE DRIVE, SPRING HILL, KS 66083
(913) 686-3080 • KC Line (913) 592-4025 • FAX (913) 686-2549

*Quality-Performance-Integrity*

July 19, 2002

Mike Seithel
Lockton Companies
444 W. 47th St., Suite 900
Kansas City, MO 64112-1906

RE:    Brownsville Additional Cost Toward Claim

Mike:

Please find below additional cost due to the crane companies dropping of the shelter at Brownsville. Lowe-North Construction, Inc. had to return to the site on 6'10/02 to remove the damaged shelter and place the new shelter. We are expecting these charges to be reimbursed.

| | |
|---|---:|
| • Labor lost – 3 men 1 day | $1,650.00 |
| • Cost to return to site to set new shelter – Electrician | 994.55 |
| • Airline Cost to return to site | 561.50 |
| • Crane Invoice to pickup & remove damaged shelter | 1,100.00 |
| • Crane Invoice to set new building | 4,980.00 |
| • Office Hours | 520.00 |
| TOTAL COST: | **$9,806.05** |

As you can see on the Elizondo Crane Service invoice, the storage for the damaged shelter is $10.00 a day and has been accruing since 6/10/02 when the damaged shelter was replaced. (This amount **IS NOT INCLUDED** in the total cost.)

Let me know if you need additional information.

Sincerely,

Kim H. Parsley
Project Manager

Cc:  David Lowe, Lowe-North Construction, Inc.
      Sent via fax no: 816-783-9717
      Original mailed 7/19/02

# Cascade Summit Electric

Phone: 541-490-4540
Fax: 541-352-6857
Email: dbruthood@aol.com

PMB 173, 2149 W Cascade Suite 106A, Hood River, OR 97031

---

**Billing Statement** 061302

TO: Lowe-North Construction
800 A-Line
Spring Hill, KS 66083
913-686-2849

Project: Brownville, TX, Powerware TPMS Installation Project, Nexrad NWS Site, 3/27 - 6/13 - 2002

| Item | Date | Description | Amount |
|------|------|-------------|--------|
| 1 | 6-13 | Hotel Expenses, Actual Costs | 437.30 |
| 2 | 6-13 | Car Rental Expenses Actual Costs | 369.25 |
| 3 | 6-13 | Misc. Travel Expenses, Fuel, Airlines, Parking, etc. | 135.00 |
| 4 | 6-13 | Materials & Tools | 53.00 |
| 5 | 3-29 | Electrical Materials — Prepped | ▮▮▮▮ |
| 6 | 4-4 | Electrical Labor and Services | ▮▮▮▮ |

Total Charges: $ ▮▮▮▮

Balance: $ ▮▮▮▮

$994.55

Please send payment to:  Cascade Summit Electric
PMB 173
2149 W Cascade Suite 106A
Hood River, OR 97031

VENDOR #
JOB # 02-4007
CODE: 16-100
ENTERED:
PAID:

JUL 19 '02 08:58AM LOCKTON CLAIMS
MAY-14-02 TUE 08:30 AM          FAX:          PAGE 5

# Pathfinder
## TRAVEL & CRUISES

(913) 780-0500
(800) 729-0359

2111 E. 151ST STREET
OLATHE KANSAS 66062

107884 ITINERARY RECEIPT
PAGE NO.   1
PNR: 1P-7939VH

To  LOWE-NORTH CONSTRUCTION
    800 A-LINE
    SPRING HILL KS 66083



Traveler:  BRUGGEMAN/DAVID

| Agent | Customer No. | Account No. | Date |
|---|---|---|---|
| KATHY | | 9135924025 | 13MAY02 |

| Day | Date | City / Airport | Time | Carrier | Flight & Class | Service Amount |
|---|---|---|---|---|---|---|

* ELECTRONIC TICKET *   POSITIVE IDENTIFICATION REQUIRED AT CHECK-IN
**REQUEST TERMS/CONDITIONS OF TRAVEL AND CARRIER LIABILITY NOTICES FROM
  TRAVEL AGENCY OR THE TRANSPORTING CARRIER.**
RESTRICTIONS-NON-REFUNDABLE/PNLTY FOR CHGS
ISSUED BY PATHFINDER TRAVEL SERVICES OLATHE KS

A MO 10JUN LV PORTLAND ORE        130P     CONTINENTAL   1557B OK LUNCH
         AR HOUSTON-IAH           743P     BAGS ALLOWED- 3PIECE    OSTOP 737
         CO CONFO *UCOWOM
                        SEAT      24-A     **RESERVED**
                                           BRUGGEMAN/DAVID
NOT VALID FOR TRAVEL-BEFORE 10JUN/AFTER 10JUN

A MO 10JUN LV HOUSTON-IAH         850P     CONTINENTAL    469T OK
         AR BROWNSVILLE          1006P     BAGS ALLOWED- 3PIECE    OSTOP 737
         CO CONFO *UCOWOM
                        SEAT      11-C     **RESERVED**
                                           BRUGGEMAN/DAVID
NOT VALID FOR TRAVEL-BEFORE 10JUN/AFTER 10JUN

C MO 10JUN HERTZ                           CONFO-B8210455428
         S. PADRE ISLAND I-TERMINAL        PICKUP-10JUN MON/C00469-2206
         BROWNSVILLE TEXAS                 RETURN-13JUN THU/0452
         PHONE-956-542-7466
         RATE-(GUARANTEED) USD 156.72 UNLIMITED MILEAGE
         APPROX TTL USD195.14 INC TAX-OTH CHGS
         1 FULL SIZE CAR
         RF-837SKROSS

A TH 13JUN LV BROWNSVILLE         552A     CONTINENTAL   3589T OK
         AR HOUSTON-IAH           735A     BAGS ALLOWED- 3PIECE    OSTOP PRP
         OPERATED BY EXPRESSJET AIRLINES INC DBA CO EXPRESS
         CO CONFO *UCOWOM
                        SEAT      05-C     **RESERVED**
                                           BRUGGEMAN/DAVID

## 128621

| Class: A-Air H-Hotel C-Car V-Tour S-Surface X-Other Service | Class: F-First X-Economy C-First M-Y-Coach S-Sm | Status: OK-Confirmed WL-Wait List NO-Request |
|---|---|---|

This travel agency represents, and is the agent for, certain selected carriers, transportation companies, hotels, wholesalers, and service companies all of which are disclosed principals and independent contractors. This travel agency is not responsible for any negligent act or omission by any of these organizations.

NOTE: DO NOT LOSE OR DESTROY AIRLINE TICKETS, THEY MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND PROCEDURES SEE BACK OF PAGE CONCERNING SUPPLIER DEFAULTS AND TRAVEL INSURANCE.

05/14/02  TUE 08:33  [TX/RX NO 7828]  @005

*Pathfinder*
TRAVEL & CRUISES

(913) 780-0500
(800) 728-0359

211 E. 1ST STREET
OLATHE, KANSAS 66062

107884  ITINERARY RECEIPT
PAGE NO.   2
PNR:  1P-7939VH

To   LOWE-NORTH CONSTRUCTION
     800 A-LINE
     SPRING HILL KS 66083

Traveler:  BRUGGEMAN/DAVID



| Agent | Customer No | Account No. | Date |
|---|---|---|---|
| KATHY | | 9135924025 | 13MAY02 |

| Day | Date | City - Airport | Time | Carrier | Flight & Class | St | Service-Amount |
|---|---|---|---|---|---|---|---|
| NOT VALID FOR TRAVEL-BEFORE 13JUN/AFTER 13JUN | | | | | | | |
| A TH 13JUN | LV HOUSTON-IAH | 915A | CONTINENTAL | 1869B OK | | BREAKFAST |
| | AR PORTLAND ORE | 1126A | BAGS ALLOWED- 3PIECE | | | OSTOP 738 |
| | CO CONFO *UCOWOM | | | | | |
| | | SEAT | 22-D **RESERVED** | | | |
| | | | BRUGGEMAN/DAVID | | | |
| NOT VALID FOR TRAVEL-BEFORE 13JUN/AFTER 13JUN | | | | | | | |

PASSENGER                          TICKET NUMBER                          AIR AMT
BRUGGEMAN/DAVID                     50051527966097                         561.50

          SERVICE FEE MCO:  89019613B2343

     EXCHANGE DOCUMENT(S):  T-0058404517154

                              AIR FARE
                              TAX
                              ADMIN/PENALTY FEE
                              EXCHANGED FARE
                              TOTAL AIR FARE
                              SERVICE FEE
                              AMOUNT CHARGED

THIS AMOUNT WILL BE CHARGED TO CREDIT CARD: AX 3782 034119 01089

* * * *THANK YOU FOR USING PATHFINDER TRAVEL AND CRUISES* * * *
THIS TICKET IS NON-REFUNDABLE.
FEE FOR ANY CHANGES PLUS ANY FARE DIFFERENCE.

126622

| Class: A-1st  A-1st/Jr  C-Car | Class: F-1st  K-Economy | Status: OK-Confirmed |
|---|---|---|
| F-1st  J-Business | Y, S, H, Y-Coach | WL-Wait List |
| V, Q-e Travel Service | X-Standard | RQ-Request |

This travel agency represents, and is the agent for, certain as noted carriers, transportation companies, hotels, wholesalers and service companies all of which are disclosed principals and independent contractors. This travel agency is not responsible for any negligent act or omission by any of these organizations.
NOTE: DO NOT LOSE OR DESTROY AIRLINE TICKETS. THEY MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND PROCEDURES. SEE BACK OF PAGE CONCERNING SUPPLIER DEFAULTS AND TRAVEL INSURANCE.



**ELIZONDO CRANE SERVICE**

Mailing Address:
P.O. Box 5748 • Brownsville, Texas 78523
Loading - Unloading Address
4899 FM 802 and Central Avenue
Brownsville, Texas 78520
Phone: (956) 831-7174 • Fax: (956) 831-71-78

| | DATE | INVOICE # |
|---|---|---|
| | 5/31/2002 | 8675 |

# INVOICE AND SERVICE CONTRACT

BILL TO: Attn Kim Presley

**LOWE-NORTH CONSTRUCTION**
**800 A-LINE DRIVE**
**SPRING HILL, KS 66083**

JOB ADDRESS:

| ITEM | HOURS | RATE | AMOUNT |
|---|---|---|---|
| TON HYDRAULIC CRANE | | | |
| TON HYDRAULIC CRANE | | | |
| | | | |
| CONVENTIONAL CRANE | | | |

Overtime _____ Hrs @ $ _____ /Hr. x _____ (# of Men)

Customer Comments: _____

TOTAL _____

CUSTOMER P.O.
TERMS:
☐ NET 15   ☐ NET 10   ☐ C.O.D.   ☐
WE ACCEPT ALL MAJOR CREDIT CARDS
Bills are Due and Payable on Our Office in Brownsville, Cameron County, TX.

Signature at right denotes approval of hours stated above. Overtime and extra services will be added before billing.

X: _____

Approval of hours

| DESCRIPTION OF THE WORK | AMOUNT |
|---|---|
| THE CHARGE FOR THE USE OF A TRUCK TRAILER TO TRANSPORT A TPMS SHELTER FROM THE BROWNSVILLE AIRPORT AND DELIVER TO ECS YARD | 600.00 |
| THE USE OF A 75 TON CRANE TO UNLOAD PENDING THE LOADING | 500.00 |
| STORAGE PENDING AT $10.00 PER DAY | |
| SERVICE #061102 | 0.00 |

VENDOR # _____
JOB # 02-4007
CODE: 14-600
ENTERED: _____
PAID: _____

## CONDITIONS OF CONTRACT

IN CONSIDERATION OF THE EQUIPMENT AND SERVICES LISTED HEREON, ELIZONDO CRANE SERVICE (ECS), AND THE CUSTOMER NAMED BELOW AGREE AS FOLLOWS:

1. Except as otherwise mutually agreed in writing this agreement is the complete agreement between ECS and the Customer, and supersedes all other agreements or understandings written or oral.
2. If unpaid merchandise is not up to date within 5 days of date of storage, the merchandise will be liquidated without further notice.
3. Overtime in charges before 7:00 A.M. and after 5:00 P.M. on weekdays paid for 1-1/2 hours over 8 on weekdays, and for 1-1/2 hours on weekdays any holidays.
4. Customer will provide labels to the workers, and operations, when needed in moving cranes and crane. ECS equipment is and out the worksite. Reasonable care will be exercised in the packing of equipment to and out of site. Since cranes are insured operators are liable that leaks business will support, ECS incurs no liability for damage to parking lots, road surfaces and underground installations.
5. Unless repairs are furnished by ECS, Customer is solely responsible for rigging the load. ECS employees may assist Customer in rigging the load, but neither ECS nor its employees shall be liable because Customer accepts any responsibility for the rigging or any damage incurred as a result of improper rigging.
6. Swing and lifting are yielded at Customer by ECS for the Customer's convenience, and solely at the Customer's risk. ECS makes no warranty whatsoever concerning the condition of such rented equipment or its fitness for the Customer specific application.
7. Customer will provide competent personnel, when needed to direct or flag the operation of ECS equipment. If it agrees to use standard crane and derrick signals in accordance with American Standard B30.2. (B30.2) to direct or flag ECS equipment.
8. Customer assumes all responsibility and liability for the adequacy of dunnage or damage of any lifting lugs or devices encountered or in attached to the load.
9. Total charges represent travel time both ways charges (Set differences job fees will be charged for certain distances for tandward jobs, one will be charged to vendors in Customers request weekday (at least and eight hours/day).
10. Responsible by for payment, on the invoice is guaranteed by Customer named below. Billing at 1-3/4 share will be those over with prior arrangement. Customer agrees to pay interest of 10% per annum on this invoice if it is not paid within stated terms, plus all costs of collection.

OPERATION(S): _____  ☐ AM
ARRIVAL TIME: _____  ☐ PM
UNIT #(S): _____

I have read this document and accept the conditions herein.
CUSTOMER _____

| TOTAL |
|---|
| $1,100.00 |



**KUHN CRANE SERVICE, INC.**
P.O. Box 10304
Corpus Christi, TX 78460

(361) 289-1700

**INVOICE**



**BILL TO**

Lowe-North Construction, Inc.
800 A Line Dr.
Springhill, KS 66083

**JOB LOCATION**

National Weather Service
Brownsville Airport
Brownsville, TX
P.O. #TPMS 70103  Rev. 1 of 1

| P.O. # | TERMS | JOB # | FIELD TICKET # |
|---|---|---|---|

| SERVICED | ITEM | DESCRIPTION | HRS | RATE | AMOUNT |
|---|---|---|---|---|---|
| 6/10/2002 | | | | | |

THANK YOU FOR YOUR BUSINESS!

10/14/02 PEr Paul Kreiger, Hold this till
entire bill comes in as this is on the final bill
SLT

# Invoice

| DATE | INVOICE NO |
|------|-----------|
| 8/26/2002 | 8792 |

| BILL TO |
|---------|
| L W G CONSULTING |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| THE USE OF A CRANE TO LIFT A COMMUNICATIONS SHELTER | 500.00 |
| CHARGE FOR STORAGE AT $10.00 PER DAY TOTAL OF 78 DAYS FROM 6/11/02 TO 8/27/02 | 780.00 |
|  | 0.00 |

Pd credit Card Visa
8/26/2002

00 5663 . 1518

| | Total | $1,280.00 |
|--|-------|-----------|

**Fibrebond Corporation**



| | | | |
|---|---|---|---|
| **To:** | Mr. Paul Kreger | **From:** | Thomas P. Crochet |
| **Fax:** | (281) 442-2428 | **Pages:** | 1 |
| **Phone:** | (281) 442-3473 | **Date:** | 9/25/2002 |
| **Re:** | Brownsville, TX shelter – 18710 | **CC:** | Powerware Project File |

☐ Urgent    ☐ For Review    ☑ Please Comment    ☐ See Attached ☐ As Requested

Mr. Kreger,

Fibrebond is requesting your assistance regarding the Brownsville, TX shelter that we are currently holding for you. We have not been given direction on what is to be done with this building to date

We are offering the following options for your review and comment.

1. Reimburse Fibrebond for transportation costs acquired to date and remove building from site.
2. Pay standard storage fee of $10.00 per day at the end of every month beginning October 1, 2002.
3. Provide title to Fibrebond.

Please advise at your earliest convenience as to how you would like to handle this situation and we will proceed accordingly  Thank you in advance for your time and assistance and have a great day.

Sincerely,

Thomas P. Crochet
Fibrebond Corporation

Cc:    Kevin McCann / Fibrebond Corporation
       Marvin Bartlett / Fibrebond Corporation

Telephone: (318) 377-1030        Fax: (318) 377-9475



# FIBREBOND CORPORATION

1300 Davenport Drive
P.O. Box 5001
Minden, Louisiana 71058-5001
(318) 377-1030

| SHIPMENT NO | DATE SHIPPED | BILL OF LADING | PAGE |
|---|---|---|---|
| METHOD OF SHIPMENT | | FREIGHT TERMS | |

# *Invoice*

| INVOICE NO | INVOICE DATE | PRINTED ON | CUSTOMER PURCHASE ORDER NUMBER |
|---|---|---|---|
| 049493 | 09/27/02 | 09/27/02 | PAUL KREGER |
| SALES ORDER NO | PAYMENT TERMS | | CONTRACT NUMBER / SITE NAME |
| | NET 30 | | |

BILL TO
PAUL KREGER
ZURICH INSURANCE
15423 VANTAGE PARKWAY
EAST #114
HOUSTON, TX  77032-1937
USA

SHIP TO

Paid 10 14 2002 SLT

BILL TO CUSTOMER      PAULK01                    SHIP TO CUSTOMER

| LINE | PRODUCT NUMBER / PRODUCT DESCRIPTION | QTY. INVOICED / QTY. BACKORDERED | UOM | NET UNIT PRICE / LIST PRICE | NET EXTENSION | TAX | TOTAL DISCOUNT |
|---|---|---|---|---|---|---|---|
| | REMIT-TO ADDRESS: FIBREBOND CORPORATION P.O. BOX 54217 NEW ORLEANS, LA  70154-4217 USA (COPY OF COMBINED FREIGHT BILL IS ATTACHED) BLDG. S/N: EEJ525118710 | | | | | | |
| 900 | TRANSPORTATION CHARGES TO SHIP POWERWARE BUILDING FROM ALLEY'S CRANE YARD IN BROWNSVILLE,TX TO FIBREBOND CORPORATION, MINDEN, LOUISIANA | | | | 1720.00 | | |

SUBTOTAL:                    1720.00

TAX:          0.00 @    0.00%                    0.00
OUT OF STATE SALES

TOTAL:                    1720.00



COMBINED TRANSPORT

P.O BOX 3667
CENTRAL POINT, OR 97502
(541)-826-7486

FREIGHT BILL DATE
08/30/2002

FREIGHT BILL NO
416407 A

PAGE 1

SALLEY'S CRANE YARD
1699 FM 802
BROWNSVILLE, TX

COMBINED TRANSPORT, INC.
P. O. BOX 3667
5456 CRATER LAKE AVE.
CENTRAL POINT, OR 77502

$ 1,720.00

FIBREBOND CORPORATION (#12994) 129
1300 DAVENPORT DRIVE
MINDEN, LA 71055

B/L PO NO
18710

SPECIAL INSTRUCTIONS

FREIGHT BILL NO
416407 A

| PICKUP DATE | DELIVERY DATE | TRACTOR NO | TRAILER NO | SCAC |
|---|---|---|---|---|
| 08/27/2002 | 08/28/2002 | 2245 | 2245A | CMBD 7/CMBD77 |

| FLAT | NO SHIPMENTS | DESCRIPTION | CODE | WEIGHT | RATE | CHARGES |
|---|---|---|---|---|---|---|
| FLAT | 1 | FIBREBOND 500 SERIES | | 54,000 | FLAT | 1,365.00 |
| | 0 | PERMIT CHARGE P/L | 802 | 0 | | 230.00 |
| | 0 | ESCORT SERVICE P/L | 402 | 0 | | 125.00 |

Job No: Overture

Building No: 18710

Codes 01-01-000-5441

BILLED
049493
1720.00

#1720.00

| BILL TO | FIBREBOND CORPORATION (#12994) 1300 DAVENPORT DRIVE MINDEN, LA 7 Approval Gary Dar | GROSS NET 54,000 | TOTAL CHARGES |
|---|---|---|---|
| | | TERMS NET 15 DAYS   A 2% PER MONTH FINANCE CHARGE WILL BE ADDED TO ALL PAST DUE ACCOUNTS, WHICH IS AN ANNUAL PERCENTAGE RATE OF 24% | $ 1,720.00 |
| | | | $ 0.00 |
| | | | $ COD |

Codes

CARRIER NAME: Combined Transport,

CARRIER ADDRESS & ZIP: P.O. Box 3667
Central Point, OR 97502

SHIPPER #

**STRAIGHT BILL OF LADING**

ORIGINAL - NOT NEGOTIABLE

C T # - CARRIER'S USE  416407

**TO:**
Consignee
On Collect on Delivery shipments, the letters "COD" must appear before consignee's name or as otherwise provided in Item 430, Sec. 1

BILL OF LADING # 167891    TRUCK/TRAILER #

Street
Destination (Code) _Minden, LA_   ZIP _71055_

ROUTE    CUSTOMER P.O. #

**FROM:**
Shipper
Street
Origin (Code) _Brownsville, TX_   ZIP

SPECIAL INSTRUCTIONS

| NO SHIPPING UNITS | H/M | KIND OF PACKAGING, DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS (CODE) | WEIGHT (SUBJECT TO CORR.) | RATE | CHARGES |
|---|---|---|---|---|---|
| | | _18710_ | _53,420_ | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMIT C.O.D. TO

COD AMT. $

C.O.D. FEE
PREPAID ☐ $
COLLECT ☐

ADDRESS

Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of Consignor)

TOTAL CHARGES $

FREIGHT CHARGES ARE PREPAID UNLESS MARKED COLLECT

CHECK BOX IF COLLECT ☐

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property except on California intrastate shipments, where the applicable tariff provisions specify a limitation of the carrier's liability absent a release or a value declaration by the shipper and the shipper does not release the carrier's liability or declare a value, the carrier's liability shall be limited to the extent provided by such provision. See NMFC Item 172.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
$_____ per _____.

RECEIVED, subject to the classifications and lawfully filed tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination and as to each party at any time interested in all or any said property, that every service to be performed hereunder shall be subject to all the bill of lading terms and conditions in the governing classification on the date of shipment.
Shipper hereby certifies that he is familiar with all the bill of lading terms and conditions in the governing classification and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

This is to certify that the above named materials are properly classified, described, packaged, marked and labeled and are in proper condition for transportation, according to the applicable regulations of the Department of Transportation.

| SHIPPER | CARRIER | CONSIGNEE - LOAD REC'D IN GOOD CONDITION |
|---|---|---|
| PER                    DATE | PER _Combined Trans._  DATE _5/28/02_ | PER _Janette Cooper_   DATE _8-28-02_ |

Mark with "X" or "RQ" if appropriate to designate Hazardous Materials shipments as defined in the Department of Transportation Regulations governing the transportation of hazardous materials. The use of this column is an optional method for identifying hazardous materials on a bill of lading per Section 172.201(a)(1)(i) of Title 49 Code of Federal Regulations. Also, when shipping hazardous materials, the shipper's certification statement prescribed in Section 172.204 of the Federal Regulations must be indicated on the bill of lading, unless a specific exception from this requirement is provided in the Regulations for a particular material.

WHITE - ORIGINAL        CANARY - OFFICE        PINK - CONSIGNEE        GOLDENROD - DRIVER

SUBCONTRACT#
FSD-97-SKT-0032
REV.A

# SPECIAL SUBCONTRACT AGREEMENT

### EXIDE ELECTRONICS' SUBCONTRACT AGREEMENT
### FOR
### LOWE- NORTH CONSTRUCTION, INC.

### Installation Services at

**THIS AGREEMENT**, Subcontract No. FSD-97-SKT-0032, effective with the issuance of a controlling Exide Electronics' Purchase Order, by and between Exide Electronics Corporation, A Delaware corporation having offices at 8609 Six Forks Road, Raleigh, North Carolina 27615 (hereinafter called "Exide Electronics"), and Lowe-North Construction, Inc., having offices at 800 A-Line Drive, Spring Hill, KS. 66083.

### WITNESSETH:

**WHEREAS**, Exide Electronics desires to purchase from Lowe-North Construction, Inc., the labor and materials required to support site preparation and installation of the NOAA TPMS System except for those designated for Small Disadvantaged Business per the Statement of Work contained herein, or included by reference;

**WHEREAS**, the Subcontractor desires to do all things necessary to perform the services required by this Agreement and the associated Statement of Work for Exide Electronics;

**NOW THEREFORE**, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**I.**      **SCOPE OF WORK**

Subcontractor shall perform all service/work in strict accordance with all Exide Electronics' specifications, Statements of Work, drawings, and other technical requirements as provided for in Exide Electronics' purchase order, this Agreement and other instruments referenced herein.

It is the responsibility of the subcontractor to obtain all necessary licenses, permits, and other documents to comply with the regulations applicable to the projects covered by this agreement. Subcontractor shall furnish satisfactory evidence of compliance with all such regulations to Exide Electronics.

**II.**      **PURCHASE ORDERS**

Exide Electronics will issue purchase orders for services and material to be furnished by the subcontractor, which are incorporated herein by reference. Additional, different, or conflicting terms contained in subcontractor's invoices or other instruments shall not have any effect or be binding upon Exide Electronics. No modifications may be made to either this agreement or Exide Electronics' purchase orders without express, written approval by the Director of Finance and Contracts Administration or Contracts Manager. (See sample purchase order in Appendix A.)

**III.**      **QUALITY SPECIFICATIONS**

Subcontractor shall perform all work in strict accordance with the 1993 edition of the National Electric Code, as promulgated by the National Fire Protection Association, standards of workmanship generally accepted in the industry, and such other standards which are set forth in this agreement or Exide Electronics purchase orders which are incorporated herein by reference.

SUBCONTRACT#
FSD-97-SKT-0032
REV.A

Payment for services performed hereunder shall not constitute acceptance thereof. Exide Electronics shall reserve the right to inspect and test such services at any time or stage and to reject any or all of said services which are, in Exide Electronics' judgment, substandard or nonconforming.

Subcontractor, at its sole expense, shall promptly rework service not accepted by Exide Electronics; or, at Exide Electronics' option, subcontractor shall refund moneys paid by Exide Electronics for such services. Subcontractor shall indemnify and hold harmless Exide Electronics from all damages caused to Exide Electronics due to subcontractor's failure to supply the required, acceptable services.

Subcontractor shall staff the project covered by this Agreement in a manner satisfactory to Exide Electronics and in accordance with industry standards. This includes, but is not limited to, monitoring the number of employees on site at any one time, the mix of worker categories (i.e., the ratio of supervisory to direct workers shall be reasonable to Exide Electronics), and the amount of time utilized to complete any task.

## IV. SUBCONTRACT PRICE

The work defined in the Statement of Work and drawings for all TPMS sites will be performed on a firm fixed price basis in accordance with the terms and conditions of this Subcontract Agreement. The firm fixed price for the work to be performed under this subcontract is per Appendix B , Selected Subcontractor's Proposal dated February 17, 1998, attached.

## V. DIFFERING SITE CONDITIONS

The subcontractor shall promptly, and before the conditions are disturbed, give a written notice to Exide Electronics of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

Exide Electronics shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the subcontractor's cost of, or the time required for, performing any part of the work under this subcontract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the subcontract modified in writing accordingly.

No request by the subcontractor for an equitable adjustment to the contract under this clause shall be allowed, unless the subcontractor has given the written notice required; provided that the time prescribed above for giving written notice may be extended by Exide Electronics.

No request by the subcontractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this subcontract.

## VI. SUPERINTENDENCE BY THE SUBCONTRACTOR

At all times during performance of this contract and until the work is completed and accepted, the subcontractor shall directly superintend the work or assign and have on the worksite a competent superintendent who is satisfactory to Exide Electronics and has authority to act for the subcontractor.

**VII.**  **LABOR RATES PER SITE**

Compliance with Davis-Bacon Act (FAR 52.222-6) is required for this contract. The attached prevailing wage rates are required under this contract (See Appendix E. )

Vendor warrants that the prices for the services sold Exide Electronics hereunder are not less favorable than those currently extended to any other customer for the same or similar services in similar quantities. In the event Vendor reduces its prices to others for any services similar in kind to those services purchased hereunder during the term of this agreement, Vendor agrees to reduce the prices hereof correspondingly. Vendor warrants that the prices quoted shall be complete, and no additional charges of any type shall be added without Exide Electronics' express, written consent. Such additional charges include, but are not limited to, shipping, packaging, labeling, custom duties, taxes, storage, insurance, boxing, crating.

**VIII.**  **TOOLS, EQUIPMENT, and MATERIALS**

Subcontractor shall furnish or cause its employees to furnish, all the usual tools, small equipment, expendables, and consumables normally associated with the trade for the work to be performed hereunder. Expendables are defined as items that wear out more quickly than normal tools, such as drill bits, hacksaw blades, and taps. Consumables are defined as items that are used up in the normal course of performing the work, such as, cutting oil, soap, tape, and rags.

Major equipment as required for performance, such as cranes or forklifts and the operators of such equipment, shall be the responsibility of the subcontractor.

Subcontractor shall be responsible for the safe care and preservation of all property of Exide Electronics.

Subcontractor shall be responsible for CONUS/OCONUS shipping coordination of all installation materials and tools to the designated site and return to home base.

Exide assumes no responsibility for expedition of subcontractor tools to or from site.

**IX.**  **TERMINATION FOR CONVENIENCE OF EXIDE ELECTRONICS**

Exide Electronics reserves the right to terminate any order or any part thereof for the sole convenience of Exide Electronics. In the event of such termination, subcontractor shall immediately stop all work thereunder and shall immediately cause any of its subcontractors to cease such work. Subcontractor shall be paid a reasonable termination charge based on the percentage of work performed prior to the notice of termination. Subcontractor shall not be paid for any work done after receipt of notice of termination, or for any costs incurred by subcontractor's vendors which subcontractor could have avoided.

**X.**  **CONFLICTS OF INTEREST**

Subcontractor will not hire any employee of Exide Electronics to perform any service covered by this Agreement. Subcontractor affirms that, to the best of subcontractor's knowledge, there exists no actual or potential conflict of interest between the subcontractor's business, employees, family, or otherwise and its performance of the services under this Agreement. In the event subcontractor learns of any actual or potential conflict of interest in the course of this Agreement, subcontractor shall promptly notify Exide Electronics of the particulars thereof and promptly meet with Exide Electronics to eliminate any such conflict.

SUBCONTRACT#
FSD-97-SKT-0032
REV A

**XI.**     *SITE SECURITY*

Subcontractor is responsible for the conduct, of subcontractor's employees and vendors at all times. Subcontractor agrees to coordinate its own and its subcontractors' on site activities with site security and Exide Electronics' designated representative at all times. Subcontractor personnel, including vendors, will restrict their dialogue with site personnel (other than Exide Electronics' representatives) to security issues only.

**XII.**     *NON-DISCLOSURE of CONFIDENTIAL INFORMATION*

Exide Electronics and subcontractor agree to enter into a confidential business relationship for the project covered by this Agreement. In order to perform this project, subcontractor may acquire valuable trade secrets, proprietary and/or other confidential information of Exide Electronics.

Confidential information means any information, oral or written, that is not generally known outside of Exide Electronics including, but not limited to, information related to products, designs, methods of manufacture or research, marketing plans, customer lists, pricing methods, personnel and organizational data.

Subcontractor will use reasonable care to safeguard all confidential information and shall not use such information for its own benefit, nor disclose such information to third parties, without the prior written consent of Exide Electronics.

Nothing in this Agreement shall: (i) obligate Exide Electronics to disclose any information to, or enter into any other agreement or arrangement with, Subcontractor; (ii) be construed as granting any rights, by license or otherwise, in any software or inventions of Exide Electronics. Subcontractor's non-disclosure and confidentiality obligations under this Agreement shall survive any termination of this Agreement, regardless of the manner of such termination, and shall be binding upon subcontractor's heirs, successors and assigns.

Subcontractor's obligation of confidentiality shall not apply to information which is publicly available at the time of disclosure, is disclosed to subcontractor by a third party who is not in breach of any obligation of confidentiality, or becomes publicly available after disclosure through no act of subcontractor. Upon request, subcontractor shall immediately return to Exide Electronics all tangible materials made available or supplied by Exide Electronics including, but not limited to, drawings, documents, hardware, disks and tapes without retaining any copies, notes or extracts.

At the request of Exide Electronics, each person rendering services under this Agreement shall execute Exide Electronics' standard Non-Disclosure Agreement prior to commencement of, or during the performance of, those services.

**XIII.**     *PAYMENTS AND PERFORMANCE BOND and INSURANCE*

If so requested by Exide Electronics, the subcontractor shall furnish a Payment and Performance Bond. The bond shall be subject to Exide Electronics' approval in all respects and duplicate copies shall be duly executed and submitted to Exide Electronics.

Subcontractor and any lower-tier subcontractor doing work under this contract are required to provide the types of insurance with at least the minimum limits as set forth below. These project-specific certificates must be addressed to Exide Electronics from the carrier and include statements; (1) agreeing to a minimum of **thirty (30) days** notice to Exide Electronics prior to cancellations or change; and (2) naming Exide Electronics as an additional insured.

Commercial General Liability Insurance, Occurrence form, including, but not limited to premises-operations, explosion and collapse hazard, underground hazard, broad form property damage, products/completed operations, contractual liability, independent contractors, and personal injury; with limits not less than:

4

SUBCONTRACT#
FSD-97-SKT-0032
REV.A

| | |
|---|---|
| $2,000,000 | General Aggregate |
| $1,000,000 | Products-Completed Operations Aggregate |
| $1,000,000 | Personal and Advertising Injury |
| $1,000,000 | Each Occurrence |
| $ 100,000 | Fire Damage (any one fire) |
| $ 100,000 | Medical Expense (any one person) |

Automobile Liability Insurance, Comprehensive form, with limits not less than:

| | |
|---|---|
| $1,000,000 | Combined Single Limit; OR |
| $1,000,000 | Bodily Injury (each person) |
| $1,000,000 | Bodily Injury (each occurrence) |
| $ 50,000 | Property Damage (each occurrence) |

Excess Liability, Umbrella form and Occurrence form, with limits not less than:
$5,000,000 (each occurrence)

Worker's Compensation Insurance by the state(s) or OCONUS country in which the project is to be performed; and Employer's Liability Insurance with limits not less than:

| | |
|---|---|
| $100,000 | Each Accident |
| $500,000 | Disease-Policy Limit |
| $100,000 | Disease-Each Employee |

Subcontractor shall maintain Comprehensive Public Liability and Property Damage Insurance, including Motor Vehicle Public Liability and Property Damage coverage, and shall submit certificates covering such insurance to Exide Electronics.

XIV.   *LIABILITIES AND INDEMNIFICATION*

Subcontractor shall be liable for the loss, damage or destruction of property or injury to persons in connection with the performance of this Agreement by Subcontractor, its employees, agents, sub-subcontractors, and representatives.

Subcontractor agrees to indemnify and save harmless Exide Electronics, its officers, customers, agents and employees against all liability, obligations, claims, loss and expense, arising directly or indirectly out of injuries suffered or allegedly suffered by any person or damage to property caused or created by subcontractor or its subcontractors, or the agents or employees of either, whether negligent or not, (a) in the course of their employment, (b) in the performance of the work hereunder, or (c) upon premises owned or controlled by Exide Electronics or its customer.

Subcontractor shall indemnify and save harmless Exide Electronics and the owner of any real property upon which the work is to be performed against any liability caused directly or indirectly by subcontractor or its sub-subcontractors or their employees or agents.

XV.   *WARRANTY*

All services rendered to Exide Electronics shall be warranted by subcontractor to be free from defects in materials and workmanship under normal use and operation for a period of twenty-four (24) months from the date of acceptance by Exide Electronics.

5

SUBCONTRACT#
PSD-97-SKT-0031
REV.A

Subcontractor expressly warrants that all services furnished under this Agreement shall conform to all specifications and appropriate standards. Inspection, test, payment, acceptance or use shall not affect subcontractor's obligations under this warranty, and such warranties shall survive inspection, test, payment, acceptance and use. Subcontractor's warranty shall be for the benefit of Exide Electronics, its successors, assigns, customers, and users of services sold by Exide Electronics.

Subcontractor agrees to correct defective services conforming to the foregoing warranties promptly and without expense to Exide Electronics. If, after reasonable notice, subcontractor fails to promptly correct defects in non-conforming services, Exide Electronics may make such corrections and charge subcontractor for all costs incurred to do so. Alternatively, Exide Electronics may require refund of all moneys paid for non-conforming services.

## XVI. WAIVER

Exide Electronics' failure to insist on performance of any of the terms or conditions herein or to exercise any right or privilege; or Exide Electronics' written waiver of any breach hereunder; shall not hereafter waive any other terms, breach, conditions, or privileges, whether of the same or similar type.

## XVII. ASSIGNMENTS and SUBCONTRACTING

Neither party may assign nor delegate, in part or in whole, his Agreement without the prior written approval of the other party.

Subcontractor shall not subcontract any portions of the work without prior written approval of Exide Electronics. In an approved subcontract, the rates shall not exceed: (1) those regularly agreed upon between subcontractor and the lower-tier subcontractor for similar work, or (2) those provided in any then-current contract between Exide Electronics and the lower-tier subcontractor for similar work, or (3) those Labor Rates shown in this Agreement; unless specific written approval is given by Exide Electronics. Subcontractor agrees that it shall derive no profit directly or indirectly by reason of any lower-tier subcontract hereunder.

## XVIII. TIME and PERSONNEL PROVISIONS

Standard of Work   Subcontractor agrees that: (1) project will be adequately staffed each and every work day of the week (excluding weekends and holidays, except when specifically requested by Exide Electronics) from the effective date of this Agreement and until written project acceptance by Exide Electronics; (2) the performance of all work and services hereunder will conform to high professional standards; (3) only qualified and competent persons will be employed in the performance of this order and (4) the regular wages of such persons will not be less than the minimum wage, or the rate contractually required by the Davis-Bacon Act or any other Federal regulation, (or wage classification) for the type of work performed. CERTIFIED PAYROLLS ARE REQUIRED.

Work Week and Work Hours Exide Electronics' standard work week consists of Monday through Friday. Each worker shall record his time daily on the "Subcontractors Weekly Time Report" (hereinafter called Time Report).

Regular Time (RT) shall mean the first eight (8) hours worked each day Monday through Friday. Overtime (OT) shall mean any hours in excess of RT each week day and any hours worked on Saturday or Sunday. Double time (DT) shall mean any hours worked on a holiday, or Sunday where applicable. For purposes of this Agreement, approved holidays are New Years Day, Memorial Day, Independence Day (July 4th), Labor Day, Thanksgiving Day, and Christmas Day. If a holiday falls on Saturday, the First day before will be observed; if on Sunday, the Monday after will be observed.

Statement of compliance. Each certified payroll shall be submitted to be received by Exide Electronics by the fourth calendar day after the end of a standard work week. Each certified payroll will be accompanied by a "Statement of Compliance." (DD form 879) signed by the subcontractor, or his or her agent who pays, or supervises the payment of, the persons employed under the contract.

6.

*For overtime and double time, subcontractor must obtain the prior written consent of Exide Electronics stating the specific day(s) and hours approved* in advance by the Government Contract Administrator, as more fully identified elsewhere in this document. In the absence of the prior written approval of the Contract Administrator, payment for overtime or double time shall not be made by Exide Electronics.

XIX.     **TERMS OF PAYMENT**

Labor Invoice  Subcontractor shall submit his invoice for labor upon completion of work. The Labor invoice must contain the following items shown in a clear and logical manner:

        (1)     Contract Number (50-DGNW-7-9004)
        (2)     Exide Electronics Purchase Order Number
        (3)     Subcontract Agreement Number (FSD-97- SKT- 0032)
        (4)     Description of Work Performed
        (5)     Total charges for labor

Material Invoice  Subcontractor must submit a separate billing for material furnished. Subcontractor invoice shall be no more than the cost of the material, showing:

        (1)     Contract Number (50-DGNW-7-9004)
        (2)     Exide Electronics' Purchase Order Number
        (3)     Schedule of materials showing:
                a. Part number
                b. Description
                c. Quantity
                d. Item cost

Subcontractor must provide proof of delivery to the installation sites in support of invoice.

Records  Subcontractor and its subcontractors shall maintain detailed, complete, and accurate accounting and job cost records. All records supporting the charges for direct labor hours, materials, equipment, and subcontract services shall be maintained in accordance with the "Examination of Records" clause of the Federal Acquisition Regulations (FAR), incorporated herein by reference. Exide Electronics shall have the right under this agreement to inspect and audit all such records of subcontractor and its sub-subcontractors at any time during and after this Agreement, and subcontractor and its subcontractors shall do all things to permit and facilitate such examination

Payment  After inspection and acceptance of a properly submitted invoice, Exide will process the invoice for payment. Terms of the billing are net (30) days from the date of receipt by Exide Electronics.

Set Off  All claims for money due or to become due from Exide Electronics shall be subject to deduction or set off by Exide Electronics by reason of any counterclaim arising out of this or any other transaction with the subcontractor.

Subcontractor along with his final invoice will submit a total release of any claims against Exide Electronics. Subcontractor shall indemnify Exide Electronics against any cost or liability, including attorney's fees, for failure of subcontractor to perform all its obligations and pay all of its bills as required by this subcontract.

XX.     **OCCUPATIONAL SAFETY and SAFETY**

Exide Electronics requires that Contractors and Subcontractors at every tier comply with the requirements of the Occupational Safety and Health Act of 1970 and the Construction Safety Act of 1969 (if applicable). Also, Air Force Occupational Safety & Health Standards developed according to Air Force Regulation (AFR) 127-12 is applicable if the work is performed on an Air Force installation. These requirements, standards and regulations are hereby incorporated by reference.

These laws and other applicable laws and government regulations for the protection of employees is exclusively the obligation of the subcontractor, its agents, and tier of sub-subcontractors, and Exide Electronics shall assume no liability or responsibility for the subcontractor's compliance or noncompliance with such requirements.

XXI.    ACCIDENT PREVENTION

The subcontractor shall provide and maintain work environments and procedures which will (1) safeguard the public and Government personnel, property, materials, supplies, and equipment exposed to subcontractor operations and activities; (2) avoid interruptions of Government operations and delays in project completion dates; and (3) control costs in the performance of this contract.

For these purposes on contracts for construction or dismantling, demolition, or removal of improvements, the subcontractor shall – -

(1) Provide appropriate safety barricades, signs, and signal lights;

(2) Comply with the standards issued by the Secretary of Labor at 29 CFR part 1926 and 29 CFR part 1910; and

(3) Ensure that any additional measures Exide Electronics determines to be reasonably necessary for the purposes are taken.

If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the subcontractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of the solicitation.

Whenever Exide Electronics becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, Exide Electronics shall notify the subcontractor orally, with written confirmation, and request immediate initiation of corrective action. This notice, when delivered to the subcontractor or the subcontractor's representative at the work site, shall be deemed sufficient notice of the noncompliance and that corrective action is required. After receiving the notice, the subcontractor shall immediately take corrective action. If the subcontractor fails or refuses to promptly take corrective action, Exide Electronics may issue an order stopping all or part of the work until satisfactory corrective action has been taken. The subcontractor shall not be entitled to any equitable adjustment of the contract price or extension of the performance schedule on any stop work order issued under this clause.

The subcontractor shall insert this clause, including this paragraph, with appropriate changes in the designation of the parties, in subcontracts.

XXII.    GOVERNING LAW

This Agreement shall be governed by the laws of the State of NORTH CAROLINA. All disputes, claims, causes of actions, complaints or lawsuits between the parties to the Agreement with regard to any provision of the Agreement, or arising out of or in any way concerning this Agreement, shall be brought in the Federal District Court for the Eastern District of North Carolina, Raleigh Division, or the Courts of the State of North Carolina for Wake County.

8

SUBCONTRACT#
FSD-97-SKT-0032
REV A

## XXIII. GOVERNMENT CONTRACT

This Agreement is placed under a Government Contract and each clause identified as a Federal Acquisition Regulation clause within this Agreement, any Exide Electronics purchase order, or other similar document, is hereby incorporated by reference for the duration of this Agreement.

Subcontractor acknowledges and agrees that where the terms "Contracting Officer", "Government", "Procurement Official, or similar terms are utilized in Federal Acquisition Regulation clauses, certifications, and/or representations incorporated by reference or otherwise in this Agreement or any Exide Electronics purchase order, or other similar document, such terms shall be deemed to mean Exide Electronics for the purpose of granting to Exide Electronics hereunder the same rights granted to the Government by applicable statutes, laws, and regulations.

## XIV. ADMINISTRATION OF CONTRACT

Both Exide Electronics and Vendor shall assign an individual to administer this Agreement throughout its term. Jerry F. Pugh, or Lisa Kennedy, shall be such individual on behalf of Exide Electronics and may be contacted at 8609 Six Forks Road, Raleigh, North Carolina, 27615 USA, Phone: (919) 870-3143; (919) 870-3126. The corresponding subcontractor individual shall be _____, or his/her designate, at _____, having offices at _____. All matters related to the performance of this Agreement shall be administered through those individuals or their designates.

## XXV. APPENDICES

The following Appendices are herewith incorporated into and made a part of this Agreement:

| | |
|---|---|
| Appendix A: | Sample Purchase Order |
| Appendix B: | Selected Subcontractor's Proposal dated February 17, 1998 |
| Appendix C: | Sample Time Sheet |
| Appendix D: | Davis Bacon Local Wage Determination |

*IN WITNESS WHEREOF*, with the intent to be legally bound, Exide Electronics has caused this Agreement to be signed by its authorized representative and Subcontractor with the same intent has caused this Agreement to be signed by its duly authorized representative on its own behalf.

*EXIDE ELECTRONICS CORPORATION* _____

_____     _____
*DULY AUTHORIZED REPRESENTATIVE*     *DULY AUTHORIZED REPRESENTATIVE*

_____     _____
*TITLE*     *TITLE*

_____     _____
*DATE*     *DATE*

9

**HCS**                                                                **HCS**

**PHONE OR FAX 956-687-6773**
**P.O. BOX 2993**
**MCALLEN, TX 78502**

## HENDRICK CLAIM SERVICE

### (BROWNSVILLE TO RIO GRANDE CITY)

June 10, 2002

Kathy Rose
Zurich North America
P. O. Box 619507
Dallas, Texas 75261-9507

Re:   Insured:        Lowe-North
      Claimant:       United States Department of Commerce
      Claim No:       972-0004357
      My File No:     2057
      Date of Loss:   March 27, 2002

Dear Kathy:

This loss was first assigned to us on June 6th. The loss was inspected on June 7th. I met with Mr. Bob Wittreich, who is an Electrical System Analyst With the United States Weather Bureau. Mr. Wittreich is in charge of all electrical components at the Brownsville, Texas weather station. Mr. Wittreich states he was present when the building with the back up battery system installed in it was being delivered. He states Mobile Crane Service of Pharr, Texas was unloading the pre-fabricated building and setting it on its foundation when they dropped the building around 5 feet. They were several feet off on the lowering of the building onto its concrete foundation. The building came down on top of a conduit that was supposed to go into a built in hole in the building floor. The conduit came up through the floor. There is also a small chip in the concrete wall on one corner of the building. There does not appear to be any other damage to the building. The floor is constructed of 12" square vinyl tile flooring over a plywood sub-floor. It is not know what is under the plywood sub-floor. Mr. Wittreich stated it appeared to be lightweight concrete.

I asked Mr. Wittreich if anyone had tried out the constant power supply that is inside of the building and he indicated that he had not. When asked why he hadn't checked out the system, he advised he did not want to hook up the system to the multi million dollar Doppler Radar and this would be the only way he could check it out.

Mr. Wittreich also advised the building was being exchanged on Tuesday, June 11th. They are picking up the damaged building and replacing it with another on that date. He does not know where they are taking the damaged building.

Mr. Wittreich stated he was told Mobile Crane did not show up with the large crane they were suppose to have used on the building. The building weighs 67,000 lbs. The job foreman questioned the crane operator before he ever started, as he did not appear to feel the crane was large enough to pick up the building.

I have talked with Mr. Stacy Hamby of Frontier Adjusters who is representing Mobile Crane Service. He has indicated he will give me copies of photos that he took when he first was assigned the claim. He also indicated he would also give me a copy of the statement he took from the mobile crane operator. At present time I have neither of these however will forward them to you if and when I am able to get them. It also appears they have accepted liability.

I am enclosing photos that I took of the building and damage along with a disc that I obtained from Mr. Wittreich. This disk has photos that he took at the time of the accident.

I am unable to complete an estimate on the damage to this building without cutting a hole in the building sub floor to see what is on the bottom side. It does appear this damage is very minor. I would recommend contacting the manufacture of the building to get an estimate or at least to find out what is on the bottom of the building to complete an estimate on this building. I can follow up and does this if you so desire. Fibrebond Corp. manufactured the building. There address is: 1300 Davenport Drive, Minden, Louisiana 71055. Their phone number is 318 377-1030. The building has the serial number #18710.

I am taking the liberty of closing my handling at this time. If you have any questions or wish to discuss this loss in any way, please feel free to give me a call.

Sincerely,

Larry Hendrick

Larry Hendrick

 **ZURICH**

| BILL | POLICY NUMBER | PRODUCER NUMBER | ACCOUNT NUMBER | AUDIT PERIOD |
|------|---------------|-----------------|----------------|--------------|
| A | CON 50840702 | 02005882 | MC11089964-001-00000 | Annual |
| BRANCH  KE  ZURICH GROUP - KANSAS CITY | | | | NEW BUSINESS EFF 01/01/2002 |

# CONTRACTORS POLICY

## BUILDERS RISK AND INSTALLATION COVERAGE DECLARATIONS

This Coverage Part consists of this Declarations Form, the Common Policy Conditions and the Forms and Endorsements indicated as applicable on the Forms and Endorsements Applicable List.

| COVERAGE DESCRIPTION | DEDUCTIBLE | LIMITS |
|----------------------|------------|--------|
| COVERAGE LIMIT AT PROJECT SITE(S) | $1,000 | $250,000 |
| | | |
| | | |
| | | |
| PROPERTY WHILE IN TRANSIT | $1,000 | $100,000 |
| PROPERTY AT TEMPORARY LOCATION | $1,000 | $100,000 |
| FOR ALL COVERED PROPERTY | $1,000 | $250,000 |
| | | |

| ADDITIONAL COVERAGES | DEDUCTIBLE | LIMITS |
|----------------------|------------|--------|
| CONSTRUCTION FORMS AND SCAFFOLDING | NONE | $100,000 |
| VALUABLE PAPERS AND RECORDS | NONE | $ 25,000 |
| OUTDOOR TREES, SHRUBS, PLANTS AND LAWNS | NONE | $ 25,000 |
|   MAXIMUM ANY ONE TREE, SHRUB OR PLANT | NONE | $    500 |
| DEBRIS REMOVAL  -  MAXIMUM ANY ONE LOSS | NONE | $100,000 |
| POLLUTANT CLEAN-UP AND REMOVAL | NONE | $ 25,000 |
| FIRE DEPARTMENT SERVICE CHARGE | NONE | $ 10,000 |
| COST TO REFILL FIRE PROTECTIVE DEVICES | NONE | $ 10,000 |
| REWARD | NONE | $  5,000 |
| | | |
| | | |

| SUBLIMITS OF INSURANCE | | |
|------------------------|--|--|
| EARTH MOVEMENT | | NOT COVERED |
| | | |
| WATER | | NOT COVERED |
| | | |
| | | |
| | | |

INLAND MARINE

SC4003  Ed. 4-97

3/12/2002

 **ZURICH**

| BILL CD | POLICY NUMBER | PRODUCER NUMBER | ACCOUNT NUMBER | AUDIT PERIOD |
|---|---|---|---|---|
| A | CON 50540702 | 02005882 | M01108S994-001-00000 | Annual |
| BRANCH  KE  ZURICH GROUP - KANSAS CITY | | | | NEW BUSINESS  EFF  01/01/2002 |

## CONTRACTORS POLICY

## BUILDERS RISK AND INSTALLATION COVERAGE DECLARATIONS

This Coverage Part consists of this Declarations Form, the Common Policy Conditions and the Forms and Endorsements indicated as applicable on the Forms and Endorsements Applicable List.

| SUBLIMITS OF INSURANCE | DEDUCTIBLE | LIMITS |
|---|---|---|
| EXISTING BUILDING(S)  OR  STRUCTURE(S) | NONE | NOT COVERED |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| COVERAGE EXTENSIONS | DEDUCTIBLE | LIMITS |
|---|---|---|
| SOFT COSTS | | NOT COVERED |
| ___ CONSECUTIVE DAYS DEDUCTIBLE | | |
| | | |
| ORDINANCE OR LAW | | NOT COVERED |
| DEMOLITION COST | NONE | NOT COVERED |
| INCREASED COST OF CONSTRUCTION | NONE | NOT COVERED |
| | | |
| BUSINESS INCOME & EXTRA EXPENSE COVERAGE DURING | | NOT COVERED |
| CONSECUTIVE 30 DAYS PERIOD | | |
| TOTAL LIMIT FOR BUSINESS INCOME & EXTRA EXPENSE | | NOT COVERED |
| ___ CONSECUTIVE DAYS DEDUCTIBLE | NONE | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

INLAND MARINE

9C4003  Ed  4-97

**3/12/2002**

 **ZURICH**

| BILL | POLICY NUMBER | PRODUCER NUMBER | ACCOUNT NUMBER | AUDIT PERIOD |
|------|---------------|-----------------|----------------|--------------|
| A | CON 50540702 | 02005882 | M011089994-001-00000 | Annual |
| BRANCH KE ZURICH GROUP - KANSAS CITY | | | NEW BUSINESS EFF 01/01/2002 | |

## BUILDERS RISK AND INSTALLATION POLICY

## SUPPLEMENTAL DECLARATIONS

| COVERAGE PART(S) AND FORM OR ENDORSEMENT NUMBER | FORM OR ENDORSEMENT NAME AND FORM OR ENDORSEMENT SUPPLEMENTAL INFORMATION |
|---|---|
| 9C4003 0497 | BUILDERS RISK AND INSTALLATION DECLARATIONS |
| | PROJECT DESCRIPTION<br><br>ALL PROJECTS |
| 9C4003 0497 | BUILDERS RISK AND INSTALLATION DECLARATIONS |
| | PROJECT LOCATION<br><br>ALL LOCATIONS WITHIN POLICY TERRITORY |
| | |
| | |
| | |
| | |
| | |
| | |

| 9CC009 Ed 4-97 | 3/12/2002 |
|---|---|

# BUILDERS RISK AND INSTALLATION COVERAGE SUPPLEMENTAL DECLARATIONS

| Named Insured: | | | Policy Number: | |
|---|---|---|---|---|
| LOWE-NORTH CONSTRUCTION, INC. | | | CON 5C840702 | |

| Producer: | | | | Policy Period: | |
|---|---|---|---|---|---|
| LOCKTON COMPANIES, INC. | From | 01/01/2002 | To: | 04/01/2003 | |

## REPORTING FORM PROVISIONS

Reporting Form Options.

|   | Completed Value |
| | Values at Risk |
| X | Gross Receipts |

Reporting Frequency        ANNUAL

Reporting Rate             .07

Annual Deposit Premium    $ 2,500

Minimum Annual Premium    $ 2,500

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc. 1988, 1990, 1991, 1994
Copyright 1997 Maryland Casualty Company as an additional part and revision.

801626 Ed 1-97



| BR. | POLICY NUMBER | PRODUCER NUMBER | ACCOUNT NUMBER | AUDIT PERIOD |
|-----|--------------|-----------------|----------------|--------------|
| A | CON 50840702 | 02005682 | M011089994-001-00000 | Annual |

BRANCH  KE  ZURICH GROUP - KANSAS CITY                          NEW BUSINESS  EFF  01/01/2002

## CONTRACTORS POLICY

## FORMS AND ENDORSEMENTS APPLICABLE LIST

| | FORM NUMBER | FORM OR ENDORSEMENT NAME |
|---|---|---|
| | GENERAL LIABILITY | |
| * | CG0300  0196 | DEDUCTIBLE LIABILITY INSURANCE |
| * | CG2010  0397 | ADDITIONAL INSURED-OWNERS LESSEES OR CONTRACTORS -B |
| * | CG2503  0397 | DESIGNATED CONSTRUCTION PROJECT(S) GENERAL |
| | | AGGREGATE LIMIT |
| * | CG2504  0397 | DESIGNATED LOCATION(S) GENERAL AGGREGATE LIMIT |
| * | IL0017  1198 | COMMON POLICY CONDITIONS |
| * | IL0021  1194 | NUCLEAR ENERGY LIABILITY EXCLUSION |
| | 801402  0396 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| | 930062  0295 | BLANKET ADDITIONAL INSURED - ENGINEERS  ARCHITECTS |
| | | OR SURVEYORS |
| * | UGL1039A 0701 | ELECTRONIC DATA LIABILITY AMENDMENT ENDORSEMENT |
| * | CG2404  1093 | WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST |
| | | OTHERS TO US |
| * | 930080  0695 | COMPOSITE RATE ENDORSEMENT GENERAL LIABILITY |
| * | CG0109  1185 | KANSAS AND OKLAHOMA CHANGES - TRANSFER OF RIGHTS |
| * | 9C0009  0497 | SUPPLEMENTAL DECLARATIONS |
| * | CG0054  0397 | AMENDMENT OF POLLUTION EXCLUSION - EXCEPTION FOR |
| | | BUILDING HEATING EQUIPMENT |
| | | |
| | INLAND MARINE | |
| * | IL0160  0695 | KANSAS CHANGES - CANCEALMENT, MISREPRESENTATION |
| | | OR FRAUD |
| * | IL0261  0498 | KANSAS CHANGES CANCELLATION AND NONRENEWAL |
| * | 9C4006  0497 | COMMERCIAL INLAND MARINE DECLARATIONS |
| * | 9C4001  0497 | CONTRACTORS EQUIPMENT DECLARATIONS |
| * | 9C4002  0497 | CONTRACTORS EQUIPMENT SCHEDULE |
| * | 40028  0992 | CONTRACTORS EQUIPMENT COVERAGE FORM |
| * | 960013  0193 | BORROWED CONTRACTORS EQUIPMENT COVERAGE |
| * | CM0202  1185 | KANSAS CHANGES - LEGAL ACTIONS AGAINST US |

* THESE FORMS ARE ATTACHED.  REMAINING FORMS WERE ATTACHED TO A PREVIOUS COPY OF THE POLICY

9C0010  Ed. 4-97                                                    3/12/2002

 **ZURICH**

| BILL | POLICY NUMBER | PRODUCER NUMBER | ACCOUNT NUMBER | AUDIT PERIOD |
|---|---|---|---|---|
| A | CON 508-0702 | 02005882 | M311089994-001-00000 | Annual |

| BRANCH   KE   ZURICH GROUP - KANSAS CITY | NEW BUSINESS EFF 01 01 2002 |
|---|---|

# CONTRACTORS POLICY

## FORMS AND ENDORSEMENTS APPLICABLE LIST

| | FORM NUMBER | | FORM OR ENDORSEMENT NAME |
|---|---|---|---|
| | INLAND MARINE | | |
| * | CM0001 | 0695 | COMMERCIAL INLAND MARINE CONDITIONS |
| * | IL0941 | 0102 | EXCLUSION OF WAR, MILITARY ACTION AND TERRORISM |
| * | 9C4003 | 0497 | BUILDERS RISK AND INSTALLATION DECLARATIONS |
| * | 40660 | 1098 | BUILDERS RISK AND INSTALLATION COVERAGE FORM |
| * | 9C0009 | 0497 | SUPLEMENTAL DECLARATIONS |
| * | 801629 | 0697 | GROSS RECEIPTS REPORTING PROVISIONS |
| * | 801626 | 0197 | BUILDERS RISK & INSTALLATION COVERAGE - SUPPLEMENTAL DECLARATIONS |
| | | | |
| | | | |

* THESE FORMS ARE ATTACHED  REMAINING FORMS WERE ATTACHED TO A PREVIOUS COPY OF THE POLICY

9C0010 Ed 4-97                                                                                     3/12/2002

Date: 3-27-02

1st REPORT

Location: National Weather Station-Brownsville, Tx.

Customer: Lowe North Construction          Fax-913-686-2849
Owner-Dave Lowe                            800-779-1042
Proj. Mgr.-Kim Parsley                     913-686-3080

(On Site)   Mac Booth-Const. Co. Supervisor
(On Site)   Dave Bruggeman-Cascade Summitt Electric Supervisor

Inspector: Gary T. Harper   Systems Engineer   405-366-6545 Ext. 3297

Equipment:      115T Crane
                Operator: Frank Avalos
                Rigger: Sergio Zamora

Incident:

While using the 115T Crane to lift a 55,000 lb. Concrete box. The crane was
unable to properly make the lift to set box on concrete slab and damage was
incurred to underside at about center of floor and as per Dave Bruggeman some
damage was incurred on underside of box at south-side or on right side as you
enter box. Metal 3" conduit was also damaged when box was set on top and
conduit was item that caused damage under the box. Exterior cosmetic damage
was also observed on left and on right side from door entrance at opposite ends.
Please see pictures enclosed. No other damage was observed at or to other
buildings in area. No damage was observed to components inside box only
observed structure damage to floor decking.

More detailed report follows.

Robert Correa

Page 1 of 4

*ROBERT SAFETY*

2nd more detailed report of 3-27-02 Incident On:

Location: National Weather Station-Brownsville, Tx.

Customer: Lowe North Construction

Equipment:    115T Crane
              Operator: Frank Avalos
              Rigger: Sergio Zamora

On or about 3-19-02 I Robert Correa was instructed by Bill Hunter (Mobile Crane Service Dispatcher) to contact Max with Lowe North Construction and meet at job site (corner of Boca Chica and Vermillion in Brownsville, Texas) to evaluate site for Crane Service to off load concrete box from carrier truck and to set on foundation slab.
I arrived at job site at approximately 9:00 a.m. and upon arrival I introduced myself and told them who I represented, two gentlemen approached me and the first gentlemen was Max and the second gentleman was Gary T. Harper, the system engineer with (R.S.I.S.) RS Information Systems, Inc.
Max showed me what they were expecting and where building was going to be set, and how much it weighed. I went to my vehicle and pulled out the measuring tape and took measurements of slab, also took measurements from edge of concrete to fence, asked Max for the weight of building and he turned over to Gary and they both told me it weighed 58,000 lbs. I then took out the load chart and showed both of them that the 115T crane could possibly do the job but that the crane had to move close to concrete slab. Max and Gary asked me what the next crane size was and I told them it was the 175 Ton. Gary and Max both asked me what the price difference between the two cranes and I showed them that the 175T crane would cost in the area of about 2,000.00 depending on time used, but the minimum charge would be some where about 2,000.00 and charges are from portal to portal I then showed them that the 115T crane would cost about 1,200.00 also charges are from portal to portal and depending on time of use. Max and Gary both looked at each other and both agreed to order the 175T crane, Max ordered crane to be at job site on 3-27-02 8:30 A.m. I remained at job site to make a sketch of job site and proposed job. Max and Gary asked me what they needed to do for crane and I told them they needed to remove fence on east side of compound and left side entrance gate, also possibly the right side entrance gate, they were also to remove plants at entrance of left side of entrance ramp to proposed job, and both agreed to all. Max told me that he would call me or office to confirm that everything was still a go just before job.
    On 3-27-02 at about 8:00a.m. Bill Hunter called me and he had just noticed job ticket on the board, and told me that the 175T crane was still out on a job at Santa Fe Lease for El Paso

2

Prod. And he asked me if the 115T Crane or the 175T was ordered for job and I responded that I
could not remember so I returned to office to look at ticket and told Bill that the 175T crane was
ordered. Bill asked me if the 115T crane would be able to do job and I told Bill that only if the
115T crane could move up closer.
The 115T crane was dispatched to job site and I then started back to Santa Fe Lease just south of
Rachel, Tx. To the El Paso production facility. Frank Avalos was the 115T crane operator and
Sergio Zamora was the rigger. Frank Avalos called me at about 1:00 p.m. and told me that there
was a problem on site and some damage had occurred to building being set. I then told him to
call Bill and advise him of the situation and I would wait for Bill to call me. At approximately
1:45 p.m. El Paso Production crew from the Jeffries facility called me to meet them in Edinburg
to play golf with Gus, Bobby, Joe T., George, Jaime, and myself. I drove back to my house to
change and pick up my golf clubs and met with them at 4:00p.m. and played until about 7:10
p.m.
     Bill Hunter called me at about 6:30 p.m. to give me information for next day and asked I
asked Bill if I could call him back later since I had customers with me and nothing to write on,
Bill responded and told me it was O.K. and for me to call him when I got home which was about
7:45 p.m
     On 3-28-02 about 7:30 a.m., Mr. James Shawn asked me about the incident and I told
him what Frank had relayed to me on 3-27-02 but I neglected to call Mr. Shawn expecting that
since Bill Hunter was in the office, Bill would relay message to him and apparently not. Mr.
Shawn instructed me to go to Brownsville to job site and take photographs and make a report and
receive verbal possibly written statements from Max. I left Mobile Crane Facility at about 7:45
a.m. and arrived at job site at about 9:00 a.m., upon arrival I was greeted by Dave Bruggeman
with Cascade Summit Electric and Max with Lowe North Construction. Max hardly said a word
to me. Dave Bruggeman was the gentleman who made all remarks about the incident, was very
vocal and at times irrate, he lead me through and showed me the site where crane was set he then
lead me to interior of concrete building and showed me the floor damage, Dave then proceeded
to show me where the metal conduit had apparently struck the floor from under side and also told
me that he had already replaced the metal conduit. I asked him if I could take photographs and
Dave agreed. Dave showed me some exterior damage apparently caused while trying to set
building on to slab, and again photographs were also taken including the plate on left side of
entrance door. Photographs were taken of interior, exterior and site at different angles.
According to Dave Bruggeman he said Frank (crane operator) lifted the box and it was too high
while trying to set on concrete slab. Frank lowered the building too fast and did not have control
of building. While trying to retract building after damage was done, Frank then dragged building
over pipe and lifted building and once again regained control and held load in suspension for
approximately 45 minutes, while deciding what to do next. I asked Dave Bruggeman to write a
statement of the incident and he responded by saying that he would write it whenever he had
some time, and that it would be sometime later because he was too busy. I also requested the
same from Gary and I got no response from him. Dave informed me that they had already taken
photographs of building after the incident and also while building had been suspended some
photographs had been taken from underside of building showing damage of different areas. I did
not observe

3

damage to any interior components or equipment except for floor damage and some on north side and one on south side exterior of building showing some scaling fallen off. Dave called Mr. Lowe from his cell to main office before Dave released me to let Mr. Lowe know that I was at job site and that he (Mr. Lowe) would be in contact with us regarding this matter or incident . I asked Dave if there was anything else I needed to know before I left and he responded that was it. and I left approx 10:45 A.m. I had requested copies of the photographs apparently taken by Dave after damage had occurred on underside of box and Dave responded that he had shipped photographs to main office and could not produce for me.


_____
Robert Correa

4

**FRANK "OPERATOR"**

**1ST REPORT**

**Job:** Lowe No ___

**Location:** Ba ___

**Job Date:** 3-2 ___

**Crane Size:** ___

**Operator:** Fra ___
**Rigger:** Sergi ___

**As per Frank:**

On March 27, ___ ___ located ___ ___tional Weather Station with Lowe North C ___ ___ set up my crane to where I could unload it from ___ ___ truck to set on ___ ground and reposition my crane to get closer to the slo ___ ___ it was ___ing ___ ___ But Mac & Gary told me that they wanted m ___ ___ ___ the true ___ ___ and I told them it was going to be hard because o ___ ___ ___ between ___ ___ slab and the small location we were in. So wh ___ ___ I repositioned ___ ___ ___ get as close as possible as I could but not to ___ ___ the ___ck b ___ ___ ___ other buildings that were there. I got as close ___ ___ I signaled th ___ ___ back up next to the crane. I lifted the building of ___ ___ ___k and swung ___ ___ ___ the slab, started booming down, after about 10 ___ ___ of booming ___ ___ started to lift from the front end. That is when th ___ ___ ing hit the botto ___ ___ a pipe that was sticking out of the slab. After thi ___ ___ ppened, I safel ___ ___ ___ the building back to a lifting position and hel ___ ___ building for abou ___ ___ ___ in the air, then they said to set it on the ground an ___ ___ ed ma ___ could ge ___ closer to set it and I said no, and that they needed a ___ ___ crane to do what they were asking me to do. So I rigged up, left the location ___ ___ the 175 ton crane ___ ___ ed off the job.

*More detailed ___ ollows*

Frank Avalos

**Job: Lowe North Const**

**Location: Brownsville, T**

**Job Date: 3-27-02**

**Crane Size: 115 Ton**

**Operator: Frank Avalo**
**Rigger: Sergio Zamora**

As per Frank

On March 27, 2002                    ss       Job to the          Weather Station in Brownsville, Tx  With Lowe
North Const Co . Bill Hum        repair        to place      that since it was a very small location, he advised me
to unload this building off t    in       to the ground    reposition my crane, and grab hold as many times as
had to.

But when I left the ya          10     am  and light    location around 10:00 a.m , Mac, which was the
person I was to contact was sa     by the inspector. I       sist   to them what I was going to do and how I was
going to do the job on unload     in       m    lay     story on the ground, repositioning my crane, lifting it
again until I got close enough    e    could    it on the   e-tv  Mac and Gary said NO!, and that I needed to
ift it from the truck and set      ri         reposit    ng the crane or setting the building on the ground.
Sergio and I talked about it      response   then  th     s     o get close to the truck we were going to be too
ur from the slab, but they p      cl      ure to b          so they said it needed to de done by lifting it off
the truck and set on the slab      a

So  what we did was          that            look like, so when I was backing the crane.
t didn't fit in the small loc      Wha         they        some bushes that were there and they did, so i
backed up the crane and me         d    to tak     re     wing because of the fence door, so we pulled
out of the little drive way er     t    o    ran    d    ther     re to the North so the crane could swing.
When I was getting off of th       the crane shou      as to close to the underwater sprinkler system.
So, I set my crane about 38        in      st I back   up  n    the left  side of the crane, close to my outrigger
and rigged up the building t       from the truck, sw     g    toward the slab, brought down about 1 foot off the
ground and Dave popped our         we    tel    ng my rigg    go that I needed to lift the building 10 or 12 feet up
n the air because that's the       did the job and Serg     stopped me and call me down to where they were and
old me that the building nee       in mid-air and I tal    d then and to Dave, and told them, that is not the way
t worked as high as those pr       to    keep    out of the     or    that was as high as I was going. He didn't like it
but that's the way we were going t    so I  went ba     the crane to get the building set on the slab and that's
when the incident happened         riggers in front of     was lifted off the ground and the building fell on pipes
that were sticking out of the      s this   why I told the     is why I needed to set it on the ground and
reposition my crane. That is       un    d it, if I could     lift it up and I did and held it in mid-air about 2 feet off
the ground for about one hou       During that time, M    d Gary came up to me and told me that if I was to
reposition my crane close to       so all I sa      that sa      I told them that I could but I was not going to do it.
So I asked them what they w        a rig    to do with the crane and Dave said to set it on the grass where the under
water sprinkler system was w       pip   on    bottom      th    building. (Which was originally what I had told
them that needed to be done        rigged down ar    left   station around 4:30 p.m.

Frank Avales



- 2nd more de:        port t 3-27-    dent On:

Location: N:        Weat er Stati    B, n sville, Tx.

Customer: L.        m  C nstruc

Equipment:          water rans
                    g    ig

On or about 3-1           ws     y  Hunter (Mobile Crane Service
Dispatcher) to c            Nor            and meet at job site (corner of Boca
Chica and Ver:            xa          ne   r Crane Service to off load
concrete box fr
I arrived at job         60 a          rival I introduced myself and told
them who I rep            app             he first gentlemen was Max and the
second gentlem:           on the              ith (R.S.I.S) RS Information
Systems, Inc.
Max showed m:           ng             g was going to be set, and how
much it weighe .           le and          suring tape and took measurements
of slab, also too        edge            nce, asked Max for the weight of
building and he       ad th          weighed 58,000 lbs. I then took out
the load chart a            s th            could possibly do the job but that the
crane had to m             lab          ked me what the next crane size was
and I told them       ery a           d me what the price difference
between the tw        then          rne would cost in the area of about
2,000.00 depend        the ml     rg  vould be some where about 2,000.00
and charges are .       ther   d  em   hat the 115T crane would cost about
1,200.00 also ch        to po    depending on time of use. Max and Gary
both looked at e.    greed       175T crane, Max ordered crane to be
at job site on 3-2       mains         nake a sketch of job site and proposed
job. Max and C.       hey ne      crane and I told them they needed to
remove fence on      und an         nce gate, also possibly the right side
entrance gate, th    lm    pl    n  entre of left side of entrance ramp to
proposed job, a.     Max          vould call me or office to confirm that
everything was s     bef   job.
        On 3-27-     Bill r       ne and he had just noticed job ticket on
the board, and .     nne             a job at Santa Fe Lease for El Paso

Prod  And he ask
could not remem
ordered.  Bill as
115T crane con
The 115T crane
Rachel, Tx  To t
Sergio Zamora
was a problem o
call Bill and adv
1.45 p.m. El Paso
to play golf wit
change and pick
p m

Bill Hun
asked Bill if I c
Bill responded a
7:45 p.m.

On 3-28
him what Fran
since Bill Hunt
Shawn instruc
receive verbal
a re and arrive
with Cascade S
to me.  Dave B
vocal and at ti
lead me to inter
to show me whe
me that he had a
Dave agreed   D
building on to c
entrance door.
According to
while trying to
of building.  W
over pipe and l
approximately
statement of the
some time, and
same from Gary
photographs of t
photographs ha
not observe

was ordered for job and I responded that I
and told Bill that the 175T crane was
to job and I told Bill that only if the

back to Santa Fe Lease just south of
was the 115T crane operator and
about 1:00 p.m and told me that there
ding being set, I then told him to
II to call me.  At approximately
called me to meet them in Edinburg
I drove back to my house to
un and played until about 7:10

nformation for next day and asked I
with me and nothing to write on,
when I got home which was about

about the incident and I told
call Mr. Shawn expecting that
to him and apparently not.  Mr.
photographs and make a report and
Mobile Crane Facility at about 7:45
was greeted by Dave Bruggeman
nstruction.  Max hardly said a word
marks about the incident, was very
d the site where crane was set he then
door damage, Dave then proceeded
the floor from under side and also told
him, if I could take photographs and
arently caused while trying to set
ncluding the plate on left side of
site at different angles.
lifted the box and it was too high
ding too fast and did not have control
was done, Frank then dragged building
and held load in suspension for
asked Dave Bruggeman to write a
would write it whenever he had
was too busy.  I also requested the
nformed me that they had already taken
building had been suspended some
owing damage of different areas.  I did

damage to any [...]        [...]        [...] for floor damage and some on north side
and one on sou[...]        [...]        [...] me scaling fallen off. Dave called Mr.
Lowe from his [...]        [...]        [...] me to let Mr. Lowe know that I was at
job site and that he       [...]        [...] with us regarding this matter or incident. I
asked Dave if there [...]  [...] I need [...] [...] before I left and he responded that was it,
and I left appro[...]      [...] requesti[...] [...] the photographs apparently taken by Dave
after damage h[...]        [...]        [...] ve responded that he had shipped
photographs to [...]       [...]        [...] me.

Robert Correa



Job: Lowe No:.     strucu...

Location: Brov·.       .⎯

Job Date: 3-27-·.

Operator: Frank ... .s
Rigger: Sergio . ...

Crane Size: 1!.

As per Sergio:

Frank and i were ·... .. ati::: :er e... ..·lo..; of the end of the crane.
When we unload.. ... ...:k.. ... I . ..: an..· to talk to management in
charge. They tok ..... ..y w....d to · .b. building 8 feet to set and we felt it
was to high. Fra... ..· emi..`.ated ... ..v.. building on the floor so he
·could move the .... ..ner b·... The.. ... na.. want to.  And they told Frank to
continue any way ... .. proc...... and ... ..ches the building fell to the side ·.
causing the floor ... a... ..

Sergio Zamora