| | | |
|---|---|---|
| STATE OF OREGON | § | |
| | § | **AFFIDAVIT** |
| COUNTY OF HOOD RIVER | § | |

BEFORE ME, the undersigned authority, on this day appeared David Bruggeman, who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

My name is David Bruggeman. I am over 18 years of age. I have never been convicted of a felony. I am fully competent to make this affidavit and I am not under the influence of alcohol or drugs or any other chemical that might otherwise affect my testimony. I declare that the following voluntary statement is made of my own free will without promise of hope or reward, without coercion, favor, offer of favor by any person or persons whomsoever.

I am the sole proprietor of Cascade Summit Electric located in Hood River, Oregon. During March of 2003, I was contacted by Lowe-North Construction and asked to provide electrical services on projects where they were installing electrical equipment for the National Weather Service. Lowe-North provided me with a schedule showing that they would mobilize their crew at the Brownsville, Texas NWS office on March 18 and plan to complete the job on March 29. The electrical work that I was to provide would consist of electrical panel work inside existing buildings, new wiring and terminations to the new shelter, and electrical tests. This work would need to be performed onsite between the time of the arrival of the new shelter and the project completion date.

I coordinated with Mac Booth, the Lowe-North superintendent, as to which day he planned to set the new shelter. I left Portland, Oregon on March 26 arriving at the NWS office in Brownsville at 8:00 a.m. on March 27. I began my electrical work inside the Nexrad generator building and a couple of hours later I could see that the crane crew had arrived. The crane began to


EXHIBIT "A"

setup approximately 20 feet from the open generator doorway where I was working. I did not have any verbal contact with the crane crew nor did I discuss the planned lift with Mr. Booth. While working on a panel near the doorway, I observed behind me that the crane lifted the new shelter from the delivery trailer. I had not heard anyone onsite give any warning or communicate to me that the lift had begun. At the moment that the building lifted from the truck I stopped work and moved to observe from a safe position, as the doorway I had been working in was in close proximity and in the direct path of the crane's swing radius.

At this point, I observed that the crane operator seemed to be moving the shelter in the air erratically and much too fast for the close clearances to the existing multiple structures on the job site. This opinion was based merely on my experience of electrical contracting with Lowe-North Construction over the last 10 years and being on their job sites while their crews have set over 100 shelters on sites very similar to this one. I did not observe anyone on the ground directing the crane operator through hand signals or verbally during this time. I could see from where I was standing that the crane was swinging the shelter dangerously close to hitting an outside electrical 200 Amp three phase switch. Mack Booth was approximately 15 feet away and seemed to be unaware of this problem, so I verbally cautioned him about this. Mr. Booth apparently becoming more concerned about the problems with the crane operator's movements and position called for the crane to stop. Mr. Booth asked the operator to step down from the crane. I heard Mack try to communicate what he wanted the operator to do.

I observed no one directing the crane operator as he then lifted the shelter 10 to 12 feet in the air and then began to lower the crane boom at a rapid rate. This downward motion never slowed until the shelter bottom hit the 3" conduit stubups which were 16" high and poured in the concrete

slab. The shelter continued down as the conduits penetrated the floor until it was finally dropped onto the concrete slab with a crash. Again without any apparent direction, the operator then tried to pick the building up, but initially could only drag the building across the slab and the conduits as they damaged the shelter bottom even more. The crane operator finally lifted the shelter and it swung like a pendulum 3 to 4 feet from the ground.

I did not direct the movements of the crane in any way. I have no training in the movements of cranes and am not familiar with work required of a flagman. I did not assist in or coordinate any of the crane operator's work on March 27, 2003.

On the next day, March 28, while continuing with the electrical wiring in the existing buildings, I was approached by a gentleman from the Mobile Crane Service who had come to the site to take pictures. He asked questions about the accident. While we discussed the events, I showed him the area of damage to the shelter. Before he left the site I let Lowe-North Construction know that I had spoken to him. Upon Lowe-North's direction I completed the electrical work that could be done onsite without terminating to the new shelter. I finished these tasks on the morning of Friday, March 29 and flew back to Portland, Oregon later that same day.

These statements were made based upon my personal knowledge and are true and correct descriptions of my services as they were provided to Lowe-North Construction for the Brownsville National Weather Service TPMS project.